#24521-rev & rem-JKK

**2008 SD 14**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

GEOFFERY E. BALDRIDGE,                              Petitioner and Appellant,

  v.

DOUGLAS WEBER, Warden of the
South Dakota State Penitentiary,                   Respondent and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
CODINGTON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE RODNEY J. STEELE
Judge

* * * *

SUSAN SHAY BRUGGER of
Brugger Law Office                          Attorney for petitioner
Brookings, South Dakota                     and appellant.

LAWRENCE E. LONG
Attorney General

GARY CAMPBELL
Assistant Attorney General                  Attorneys for respondent
Pierre, South Dakota                        and appellee.

* * * *

CONSIDERED ON BRIEFS
ON NOVEMBER 6, 2007

OPINION FILED **02/20/08**

#24521

KONENKAMP, Justice

[¶1.] As part of a plea agreement, Geoffrey E. Baldridge would plead no contest to a drug charge and cooperate with law enforcement officials in their investigation of criminal activity and reveal his sources, contacts and associates involved with illegal substances. The State promised, among other things, not to bring additional charges and to inform the court at sentencing of the extent and level of Baldridge's cooperation. At sentencing the State said nothing, and Baldridge was sentenced to the maximum term of years. Baldridge did not appeal, but he later brought a petition for habeas relief. He asserted that his defense counsel was ineffective because counsel failed to (1) appeal his sentence, (2) file a motion to suppress, and (3) object when the State breached the plea agreement. The circuit court denied relief. Because the State breached an express term of the plea agreement and counsel was ineffective in bringing it to the attention of the court, we reverse and remand for resentencing.

## Background

[¶2.] On December 20, 2003, Baldridge was stopped for speeding while driving on Interstate 29 through Codington County. He was on parole at the time. Riding in the car with him was his girlfriend. The South Dakota Highway Patrol trooper searched Baldridge's vehicle incident to arrest, and found syringes under the passenger seat and a small amount of marijuana on Baldridge's girlfriend. She claimed she obtained the marijuana from Baldridge, but later recanted and said the marijuana belonged to her. Baldridge was charged with speeding, no insurance, no

-1-

driver's license, untitled vehicle, and distribution of less than an ounce of marijuana.

[¶3.]	Baldridge was transported to the Codington County Jail, where he consented to a urinalysis. The trooper field tested the UA. It was negative. Thereafter, the sample was sent to the State Health Lab in Pierre. The sample tested positive for methamphetamine. Baldridge was returned to prison for violating his parole because he drove without a license, purchased a vehicle without his parole officer's permission, and left his prescribed jurisdiction also without permission.

[¶4.]	Baldridge was indicted in Codington County on January 26, 2004, for possession of methamphetamine and for distribution of less than one ounce of marijuana. Attorney Tracy Niemann was appointed to represent him. Plea negotiations ensued. On the advice of counsel, Baldridge entered into a plea agreement. He would plead no contest to the possession count and agree to cooperate with law enforcement officers in their investigation of ongoing criminal activities, including those he had participated in. In turn, the State promised to grant him immunity for all other drug-related crimes disclosed during his cooperation, refrain from filing additional charges, and dismiss any other charges. The State also promised to inform the sentencing court of the extent and level of Baldridge's cooperation with law enforcement investigators.

[¶5.]	At Baldridge's arraignment, the court discussed the terms of the plea agreement with him. The court asked Baldridge if he was coerced into accepting the agreement, whether he understood that he faced a possible maximum sentence

of ten years and a $10,000 fine or both, and whether he understood what the plea agreement entailed and that no promises were made other than those stated in the agreement. Baldridge responded that he understood the plea agreement and that no promises were made other than those stated. He also said he was aware of the possible maximum sentence and was not coerced to enter into the agreement. Baldridge pleaded no contest to possession of methamphetamine.

[¶6.] To comply with the cooperation portion of the plea agreement by turning over names of people involved with illegal drugs, Baldridge told Attorney Niemann that "I don't know many people anymore. I know people that do it, but I don't know anything, so don't even ask me to do a controlled buy." According to Niemann, however, Baldridge said that "he had some people that he had known in the Aberdeen area that he could provide DCI information to, and he felt comfortable doing that, and he . . . had written a list . . . with the names of the people in the Aberdeen area."

[¶7.] Later, Attorney Niemann "came back and told [Baldridge], well, [the Codington County State's Attorney] only wants people in Watertown." In response, Baldridge said, "I am not from Watertown, so I don't really know anybody." Nothing in the plea agreement limited acceptable cooperation to information about drug activity only in Watertown. Baldridge called his girlfriend, who was apparently involved with the local drug culture, and she gave him some Watertown names.

[¶8.] Baldridge then debriefed with a DCI agent in the jail. Attorney Niemann introduced them, but did not remain for this law enforcement interview

with his client. Baldridge gave the agent the information he obtained from his girlfriend. He also revealed the names of the Aberdeen people who Baldridge had direct knowledge of. Nothing in the record suggests that Baldridge was asked to participate in a controlled drug buy or a lie detector examination. More importantly, there is no evidence that the DCI found Baldridge's information untruthful or his cooperation insufficient.[1]

[¶9.]    The court ordered a presentence investigation. On May 19, 2004, Baldridge was sentenced. Attorney Niemann spoke on Baldridge's behalf, and Baldridge also spoke. The State made no comment on the level of Baldridge's cooperation, and the presentence investigation report did not contain any discussion of Baldridge's level of cooperation. Aside from mentioning to the circuit court at sentencing that his client "did comply with [the] plea agreement," Niemann never mentioned the cooperation and debriefing Baldridge gave to the DCI. Further, Niemann never requested that the State's Attorney comply with the plea agreement by informing "the sentencing judge of the extent and level of [Baldridge's]

---

1.    The dissent supports its argument that Baldridge did not cooperate with select quotes from the transcript and the presentence report. The dissent then goes on to conclude that the habeas judge did not find Baldridge credible. What the habeas judge found was that "Baldridge claimed to know nothing of any help." That is simply false. Thus, the habeas court's finding was clearly erroneous. A plain reading of the transcript shows that Baldridge met with a law enforcement officer, provided a list of names, and told him what he knew. The State never disputed this, and no claim was made that his cooperation was inadequate. The dissent's quote from the presentence report has nothing to do with the plea agreement. In the presentence report, the court services officer explained that Baldridge's "case manager" at the penitentiary did not return the court services officer's phone calls. How can that be construed against Baldridge?

cooperation with law enforcement officials in fulfilling the terms of [the] plea agreement," nor did Niemann object when the State's Attorney failed to do so.

[¶10.] In imposing the maximum penitentiary term, the court considered Baldridge's criminal record. Given Baldridge's "prolonged involvement in the drug culture," his prior convictions, and his failure to learn from his past, the judge concluded that he was a public risk. Therefore, the court imposed "a term of 10 years in the state penitentiary . . . together with $55 in court costs and an order to repay [his] court-appointed attorneys fees." A judgment of conviction was entered on May 19, 2004.

[¶11.] Baldridge claims that after his sentencing he called Niemann at his office to tell him that he wanted to appeal. According to Baldridge, Niemann would not take his call. Baldridge then enlisted help from his parole revocation attorney, Jason Shanks, to tell Niemann that he wanted to appeal his sentence. Attorney Shanks wrote to Niemann on May 20, 2004, stating that Baldridge "indicated to me his desire to appeal the length of his sentence"; that he "attempted to contact your office and speak with you regarding an appeal, however, he was unable to get through to you"; and that "Accordingly, I indicated that I would contact you via correspondence to let you know of his intentions and desires pertaining to his sentence number."

[¶12.] On May 24, 2004, Niemann wrote to Baldridge informing him that he had "now completed [the] duty of representation as your court appointed attorney." Niemann told Baldridge that he had "only thirty (30) days, which would be approximately June 18, 2004," to appeal his sentence. He also told Baldridge that

he had "no grounds for a successful appeal." Niemann's advice was "not to file an appeal at this time." And, if Baldridge disagreed with Niemann, Niemann wrote, "please advise me in writing as soon as possible so that the June 18, 2004 deadline is met." Baldridge did not contact Niemann or make any other effort to appeal his sentence.

[¶13.]     Baldridge petitioned for a writ of habeas corpus on September 7, 2004. He alleged that his due process rights were violated by the ineffective legal assistance he received from Niemann. Specifically, Baldridge claimed that Niemann (1) failed to move to suppress the UA, (2) failed to file a direct appeal, (3) did not adequately inform him of the effect of a no contest plea, and (4) did not ensure that the plea agreement was followed. He also claimed that his sentence was cruel and unusual, in violation of the Eighth Amendment.

[¶14.]     At the evidentiary hearing, Baldridge presented three witnesses: himself, Niemann, and Tom Smith, a forensic chemist at the State Health Lab in Pierre. Smith testified that he was not aware of what field tests were conducted on Baldridge's UA by the trooper. However, he stated that the test used at the lab on Baldridge's UA is highly reliable and "there are no false positives." He explained that there are procedures in place for establishing the chain of custody of a sample and that they are generally followed, but could not testify to Baldridge's sample in particular. According to Smith, Baldridge's UA had been destroyed because no one asked for it to be retested after twelve months.

[¶15.]     Attorney Niemann detailed his experience in handling criminal cases. He began law practice in 1995, and his first work involved court appointments. He

also took many public defender appointments for several years. Then, in 2000, Niemann changed employment, but still took criminal appointments for many counties. Niemann indicated that when the firm accepted a public defender contract for Codington County, he handled the majority of those appointments.

[¶16.] Niemann testified that he explained to Baldridge that the State's Attorney had a policy of bringing additional charges when a case was brought to trial. He also discussed with Baldridge his claim that the UA had been tampered with. According to Niemann, he researched Baldridge's claims and discussed them with a senior partner. They both concluded that Baldridge's claims would not support a motion to suppress. He informed Baldridge of this and told him that because the State's Attorney would be inclined to bring more charges if the matter went to trial, Baldridge should consider a plea agreement.

[¶17.] Niemann testified that when he went over the plea agreement with Baldridge, he specifically informed Baldridge that he faced a possible maximum sentence of ten years and that whatever sentence he would receive was at the sole discretion of the judge. Baldridge signed a form indicating he understood this. After Baldridge was sentenced, Niemann said that he never received a call and that Baldridge never wrote or called after Niemann sent the May 24 letter indicating his representation was complete. He also testified that he was not aware of the letter from Attorney Shank, even though it turned out to be in Baldridge's file at Niemann's office.

[¶18.] In his testimony, Baldridge claimed that his UA had been tampered with because he had not used methamphetamine since 1999. He said that he told

Niemann that the trooper altered his sample because it tested negative before it tested positive. Baldridge also said that he insisted on a jury trial because he was innocent, but Niemann told him that he would not get as harsh a sentence if he pleaded no contest. According to Baldridge, Niemann told him he would be sentenced to six months to a year. Baldridge said he was unaware that the sentence was up to the judge and he thought the State would recommend a lighter sentence.

[¶19.]    The habeas court found no violation of Baldridge's due process rights and no ineffective assistance of counsel. It explained that Niemann's decision not to file the motion to suppress was made after investigation and in consideration of the merits of the claim. Moreover, although Baldridge's parole violation attorney wrote to Niemann about Baldridge's desire for a direct appeal, Niemann wrote Baldridge and informed him that his representation was complete. Niemann explained to Baldridge his right to appeal and the time he had to do so, and Baldridge did nothing.

[¶20.]    The court also found that the State did not fail to fulfill the terms of the plea agreement. According to the court, "The problem is, Baldridge claimed to know nothing of any help, so there was nothing for Niemann to inform the judge of. The claim is thus without merit." Finally, the court found Baldridge's sentence to be constitutional: the maximum sentence was imposed in large part because of Baldridge's extensive criminal history. A ten-year sentence fit within the legislative scheme and was not grossly disproportionate. Accordingly, the court denied Baldridge's petition for habeas relief. Baldridge appeals.

## Standard of Review

[¶21.]    We apply the following standards of review in this case:

> Whether a defendant has received ineffective assistance of
> counsel is essentially a mixed question of law and fact.  In the
> absence of a clearly erroneous determination by the circuit court,
> we must defer to its findings on such primary facts regarding
> what defense counsel did or did not do in preparation for trial
> and in his presentation of the defense at trial.  This Court,
> however, may substitute its own judgment for that of the circuit
> court as to whether defense counsel's actions or inactions
> constituted ineffective assistance of counsel.

Rodriguez v. Weber, 2000 SD 128, ¶28, 617 NW2d 132, 142 (citing Meinders v.

Weber, 2000 SD 2, ¶42, 604 NW2d 248, 264 (quoting Sund v. Weber, 1998 SD 123,

¶14, 588 NW2d 223, 225) (other citations omitted)).

> Because a petition [for a writ] of habeas corpus collaterally
> attacks a final judgment, our review is limited.  Hays v. Weber,
> 2002 SD 59, ¶11, 645 NW2d 591, 595.  Habeas review is not a
> substitute for a direct appeal.  Lien v. Class, 1998 SD 7, ¶10, 574
> NW2d 601, 606.  As a general matter, habeas corpus is used to
> review only:  (1) whether the court has jurisdiction of the crime
> and the person of the defendant; (2) whether the sentence was
> authorized by law; and (3) whether, in certain cases, a defendant
> was deprived of basic constitutional rights.  New v. Weber, 1999
> SD 125, ¶5, 600 NW2d 568, 571-72.  Findings of fact are
> reviewed under the clearly erroneous standard.  *Id*.

Moeller v. Weber, 2004 SD 110, ¶10, 689 NW2d 1, 6.

## Analysis and Decision

[¶22.]     Baldridge first asserts that defense counsel was ineffective because he

failed to seek suppression of the results of the UA.  After Baldridge told Niemann of

his concerns regarding the authenticity of the UA results, Niemann researched the

issue, examined the police reports, and weighed Baldridge's claim of what

happened.  He learned that the testing done in the State lab would be regarded as

more reliable. He also believed that if the case proceeded to a jury trial, the prosecutor would be more apt to bring additional charges. He spoke with his senior partner about Baldridge's claims that the police tampered with his UA, and that it tested negative before positive. Niemann concluded that based on his research and his discussion with his partner that the issue would not support a successful motion to suppress. He advised Baldridge that the optimal choice would be to enter into a plea agreement.

[¶23.] Baldridge bears the burden of establishing that under all the circumstances defense counsel's decision not to bring a motion to suppress was an unsound strategy. *See* Weddell v. Weber, 2000 SD 3, ¶32, 604 NW2d 274, 282-83. We will not second-guess the strategic decisions of counsel. *Id.* (quoting Loop v. Class, 1996 SD 107, ¶18, 554 NW2d 189, 192 (quoting Aliberti v. Solem, 428 NW2d 638, 641 (SD 1988))). *See also Rodriguez*, 2000 SD 128, ¶28, 617 NW2d at 142.

[¶24.] The habeas court found that "[t]here is not enough evidence in the record to establish either deficient performance or prejudice[.]" Because Baldridge submitted to the UA voluntarily and the lab expert testified that the test conducted by the State Health Lab would never show a false positive, the court found that the success of a motion to suppress would be unlikely. It concluded that the decision not to file a motion to suppress based on Baldridge's chain of custody question "was a decision well within the defense attorney's professional discretion." With our deference to the court's findings and the strategic decision of defense counsel, we find no error.

[¶25.] Baldridge next argues that defense counsel was ineffective when he failed to appeal his sentence at Baldridge's request. Baldridge claims he called Niemann to inform him of his desire to appeal, but counsel did not return his call. He then had his parole violation attorney write a letter to Niemann. The letter was sent, but Niemann claims to have never seen it, even though his office had it on file. Nevertheless, Niemann did send a letter to Baldridge. In that letter, counsel informed Baldridge of his right to appeal and the time frame in which he had to do so. He also told Baldridge that it was his opinion that Baldridge should not appeal. But he warned Baldridge that if he desired to appeal, he should notify him as soon as possible. Baldridge did nothing thereafter.

[¶26.] The right to appeal is statutorily protected. SDCL 23A-32-2. "[I]t may not be indiscriminately denied." State v. Hoxie, 1997 SD 119, ¶7, 570 NW2d 379, 380 (per curiam). It is troubling that Niemann did not respond to the letter from Baldridge's parole violation attorney, which clearly informed him that Baldridge wanted to appeal. Nonetheless, after that letter, Baldridge did receive correspondence from Niemann, specifically addressing his right to appeal. It explained in detail that Baldridge had an appeal right, when it expired, and that if he still desired to appeal he should "advise in writing as soon as possible[.]" Baldridge concedes he did nothing in response to this letter. We cannot say that the habeas court erred in concluding that Baldridge's right to appeal was not indiscriminately denied or that he lost his right because of defense counsel's ineffectiveness.

[¶27.] Baldridge next asserts that counsel was ineffective because he did not ensure that the plea agreement was followed. The plea agreement required that "the State of South Dakota *will inform* the sentencing judge of the extent and level of Baldridge's cooperation with law enforcement officials in fulfilling the terms of this plea agreement." (Emphasis added). At the sentencing hearing, the State made no statement about Baldridge's cooperation. There was also nothing in the presentence investigation report that would inform the court on the level and extent of Baldridge's cooperation. Citing only the circuit court's findings as authority, the State contends that Baldridge could not identify how he cooperated, so his claim that a breach occurred is without merit. But the circuit court's finding was clearly erroneous.

[¶28.] At the habeas hearing, Baldridge plainly outlined his cooperation. It stands uncontradicted. He told how the State's Attorney, contrary to the plea agreement, limited the cooperation he wanted to only information about people in Watertown. Yet the plea agreement explicitly provided that Baldridge would cooperate with investigating "criminal activity in . . . South Dakota and the nation." Baldridge still tried to oblige this turnaround by obtaining Watertown names from his girlfriend. He also composed a list of names of Aberdeen people he knew to be involved in illicit drugs. He met with a DCI agent and provided all this information to him. Nothing in the record supports a conclusion that the State or the DCI was dissatisfied with this information or that Baldridge's debriefing was somehow not in full compliance with the plea agreement. Thus, the habeas court's finding that "Baldridge claimed to know nothing of any help" is incorrect.

[¶29.]     As we recently stated in *Vanden Hoek v. Weber*,

> [A] breach of a plea agreement implicates due process concerns. "[O]nce an accused agrees to plead guilty in reliance upon a prosecutor's promise to perform a future act, the accused's due process rights demand fulfillment of the bargain."  State v. Waldner, 2005 SD 11, ¶13, 692 NW2d 187, 191-92 (citing State v. Williams, 637 NW2d 733, 744 (2002)) (internal quotations omitted).

2006 SD 102, ¶14, 724 NW2d 858, 862-63.  It is immaterial that the sentencing judge may not have been influenced by the State fulfilling its end of the bargain. *See id.* ¶22.  When there is a breach of an agreement from a plea that rests "in any significant degree on a promise or agreement from the prosecutor, so that it can be said to be part of the inducement or consideration," the case must be remanded.  *Id.* ¶13 (quoting Santobello v. New York. 404 US 257, 262, 92 SCt 495, 499, 30 LEd2d 427 (1971)).

[¶30.]     We use a "'straight-forward interpretation'" of the State's promise when examining whether a breach occurred.  State v. Bracht, 1997 SD 136, ¶9, 573 NW2d 176, 179 (quoting United States v. McCray, 849 F2d 304, 305 (8thCir 1988); United States v. Carbone, 739 F2d 45, 47 (2dCir 1984)).  Here, the State promised Baldridge that in exchange for giving up his right to a jury trial, it "*will* inform" the sentencing court of the level and extent of his cooperation.  (Emphasis added). Baldridge was not promised that the State would recommend a lesser sentence. Rather, his agreement clearly identified that he faced the maximum possible sentence and that his sentence was at the discretion of the judge.  Nonetheless, a comment from the State on his cooperation with law enforcement authorities

certainly could have impacted the sentence he received. The State's failure to fulfill its promise resulted in a breach of a material element of the agreement.

[¶31.]     Baldridge, however, did not appeal his sentence. Therefore, to prevail in this case, he must establish that he "was deprived of basic constitutional rights." *See Moeller*, 2004 SD 110, ¶10, 689 NW2d at 6 (citing *New*, 1999 SD 125, ¶5, 600 NW2d at 571-72). Baldridge claims he was denied due process because his counsel was ineffective when he failed to ensure that the plea agreement was followed. In *Loop v. Solem*, we stated that "[b]efore a petitioner succeeds on an ineffective assistance of counsel claim, he must *normally* fulfill the twofold test stated in *Strickland v. Washington*, 466 US 668, 104 SCt 2052, 80 LEd2d 674 (1984), *reh'g denied*, 467 US 1267, 104 SCt 3562, 82 LEd2d 864." 398 NW2d 140, 142 (SD 1986). That twofold test comprises a duty to show (1) ineffective assistance of counsel and (2) prejudice. *Id.*

[¶32.]     We afford considerable deference to counsel's strategic decisions. *Moeller*, 2004 SD 110, ¶28, 689 NW2d at 10. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the petitioner must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 US at 689, 104 SCt at 2065, 80 LEd2d 674 (citing Michel v. Louisiana, 350 US 91, 101, 76 SCt 158, 164, 100 LEd2d 83 (1955)). "'The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the [process] cannot be relied upon as

having produced a just result.'" *Moeller*, 2004 SD 110, ¶28, 689 NW2d at 10 (quoting Coon v. Weber, 2002 SD 48, ¶11, 644 NW2d 638, 642 (per curiam) (citation omitted)). Furthermore, we will not second guess the factual findings of the habeas court. Hofer v. Class, 1998 SD 58, ¶7, 578 NW2d 583, 585.

[¶33.] There is nothing in the record that suggests that defense counsel's decision to do nothing when the State failed to inform the court of Baldridge's cooperation was a reasoned strategy. The testimony elicited at the habeas hearing shows that counsel was not even aware that the State breached the terms of the plea agreement. Nevertheless, the habeas court found that no breach occurred and that counsel was not in effective because "Baldridge claimed to know nothing of any help." These findings were clearly erroneous. Baldridge plainly set forth the cooperation he gave as required by his plea agreement. The express language of the agreement mandated that the State inform the court of Baldridge's cooperation. That was never Baldridge's duty. Defense counsel's failure to object when the State breached a material element of the plea agreement amounted to a denial of the assistance of counsel.

[¶34.] The State argues that Baldridge has not established prejudice in the prosecutor's failure to tell the sentencing judge of Baldridge's cooperation and defense counsel's failure to object.[2] Here, however, there is an exception to the

---

2. In its brief to this Court, the State goes further and argues that Baldridge breached the terms of the plea agreement because he could not establish how he cooperated, and therefore, the State was not obligated to perform its bargained for duty. This argument is without merit. At sentencing the State did not assert that Baldridge breached the agreement.

proof of prejudice requirement. "In certain Sixth Amendment contexts, prejudice is presumed." *Strickland*, 466 US at 692, 104 SCt at 2067, 80 LEd2d 674. One such instance is "[a]ctual or constructive denial of the assistance of counsel[.]" *Id.*; *see also* State v. Smith, 558 NW2d 379, 387 (Wisc 1997). According to the Supreme Court, "[p]rejudice in these circumstances is so likely that case by case inquiry into prejudice is not worth the cost." *Strickland*, 466 US at 692, 104 SCt at 2067, 80 LEd2d 674; *see also* United States v. Vaval, 404 F3d 144, 155 (2dCir 2005). "In order to preserve the integrity of plea bargaining procedures and public confidence in the criminal justice system, a petitioner is generally entitled to the enforcement of a plea agreement without showing a tangible harm resulting from that breach." *Vaval*, 404 F3d at 155.[3]

[¶35.] Baldridge had a substantial right to the fulfillment of the terms of his plea agreement. *See Santobello*, 404 US at 262, 92 SCt at 499, 30 LEd2d 427. This was true even if the breach was inadvertent. *Vanden Hoek*, 2006 SD 102, ¶20, 724 NW2d at 863 (citing *Waldner*, 2005 SD 11, ¶13, 692 NW2d at 192 (quoting State v.

---

3. The dissent would nonetheless require a habeas petitioner to prove prejudice in these circumstances by showing that the sentence would have been different. How is that possible? Without possessing some type of telepathic faculty, how could anyone demonstrate what would have been in a sentencing judge's mind had the judge heard material information from the prosecutor that the judge was previously unaware of, i.e. the defendant's post-plea cooperation with law enforcement drug investigators? Other than inducing unwitting defendants to plead guilty, then, what value would such prosecutorial promises have? The dissent**'s** view means that these types of promises from prosecutors are unenforceable, and court-sanctioned prosecutorial incentives for defendants to enter pleas and waive their constitutional rights are worthless. The dissent's position is also a sharp departure from our recent holding in *Vanden Hoek*, where Justice Sabers

(continued . . .)

Howard, 630 NW2d 244, 250-51 (WisCtApp 2001))). Because the State breached a material element of the plea agreement, Baldridge was not afforded a fair and reliable sentencing proceeding. In this case, the remedy for the breach is to remand the case for resentencing with a different judge. *See Bracht*, 1997 SD 136, ¶12, 573 NW2d at 180 (citing United States v. Brody, 808 F2d 944, 948 (2dCir 1986); Brunelle v. United States, 864 F2d 64, 65 (8thCir 1988)). Because we remand for resentencing, we need not address Baldridge's claim that his sentence violates his Eighth Amendment right to be free from cruel and unusual punishment.

[¶36.]     Reversed and remanded.

[¶37.]     SABERS, ZINTER and MEIERHENRY, Justices, concur.

[¶38.]     GILBERTSON, Chief Justice, concurs in part and dissents in part.


GILBERTSON, Chief Justice (concurring in part and dissenting in part).

[¶39.]     I respectfully dissent as to the Court's conclusion that Baldridge is entitled to habeas relief over a purported violation of a plea agreement. I would affirm on that issue since, he has failed to show any prejudice.

[¶40.]     This is a habeas proceeding. Thus, I fully agree with the Court that to succeed Baldridge must establish he "was deprived of basic constitutional rights." Moeller v. Weber, 2004 SD 110, ¶10, 689 NW2d 1, 6 (citation omitted). Under the *Strickland* standard, to establish a deprivation of the right to effective counsel,

---

(. . . continued)

> wrote for the majority that "[t]he inquiry is solely 'whether the [State has] met [its] obligation.'" 2006 SD 102, ¶22, 724 NW2d at 864.

Baldridge must show (1) ineffective assistance of counsel and (2) prejudice. Strickland v. Washington, 466 US 668, 691, 104 SCt 2052, 2066, 80 LEd2d 674 (1984), *reh'g denied*, 467 US 1267, 104 SCt 3562, 82 LEd2d 864.

[¶41.]     The Court errs in its application of the standards for habeas relief. At ¶32 it acknowledges under *Strickland* for the petitioner to obtain relief, he or she must establish prejudice. However, at ¶34 n3 it faults this dissenter for requiring just that--a showing of prejudice. In previous cases concerning the review of plea bargain proceedings brought pursuant to a habeas challenge, we have applied a requirement that the applicant establish prejudice. Turner v. Weber, 2001 SD 125, 635 NW2d 587; Hopfinger v. Leapley, 511 NW2d 845 (SD 1994); Petrilli v. Leapley, 491 NW2d 79 (SD 1992).

[¶42.]     The plea agreement required Baldridge to fully cooperate with law enforcement as to his knowledge of the sale of illegal drugs.[4] Nevertheless, the

---

4.     The relevant part of the plea agreement stated:

. . .
2.  Defendant will cooperate with all reasonable requests made by law enforcement officials concerning the ongoing investigation into criminal activity in the State of South Dakota and the nation including, but not limited to the Defendant's participation in these activities.

3.  Defendant will fully and truthfully apprise law enforcement officials of all of sources, contacts and associates involved in illegal drug or marijuana activity including the specific names, dates, times and places surrounding such activities. Any material misrepresentation or omission made will result in revocation of the plea bargain agreement in the State's discretion.

4.  Defendant will, at the request of law enforcement, voluntarily submit to a lie detector test or polygraph examination concerning

(continued . . .)

habeas court found that: "Baldridge claims that under the plea agreement the State was to inform the sentencing judge of the extent of the Petitioner's cooperation with law enforcement. . . . The problem was, Baldridge claimed to know nothing of any help, so there was nothing for Niemann (defense attorney) to inform the judge of." This finding is not surprising in light of Baldridge's concession:

> I told them straight up, I said, "I don't know many people any more. I know people that do it, but I don't know anything, so don't even ask me to do a controlled buy."

Moreover the pre-sentence report stated:

> This officer attempted to contact Mr. Baldridge at the South Dakota State Penitentiary via his case manager. Messages were left at the penitentiary for the case manager to contact his officer in an effort to interview Mr. Baldridge and the messages were not returned.

Thus, the finding of the trial court that Baldridge in essence did nothing to cooperate with law enforcement is not clearly erroneous. Hofer v. Class, 1998 SD 58 ¶7, 578 NW2d 583, 585.

[¶43.] The Court differs with this conclusion. Yet, a thorough review of its factual analysis shows it relies upon Baldridge's self-serving testimony. After hearing this same testimony, the habeas court ruled against him. "The credibility of witnesses and the evidentiary value of their testimony falls solely within the province of the [fact finder]." LDL Cattle Co v. Guetter, 1996 SD 22, ¶22, 544 NW2d 523, 528 (quoting Bridge v. Karls, 538 NW2d 521, 525 (SD 1995) (citing

---

(. . . continued)

> illegal activity or any of the statement[s] given to law enforcement pursuant to his agreement. Defendant's failure of this test may result in a revocation of this agreement at the State's discretion.
>
> (continued . . .)

Miller v. Hernandez, 520 NW2d 266, 272 (SD 1994))).  It has long been the rule in

this jurisdiction that a party does not have a license to get on the stand and bind

the trial court as the fact finder by uncontradicted testimony no matter how

inherently improbable it is.

> "The general rule is well settled  that where unimpeached
> witnesses testify distinctly and positively to a fact, and are
> uncontradicted, the jury are not at liberty to discredit their
> testimony, when opposed to a mere presumption to the contrary;
> but this is subject to the exception that where the statements of
> the witness are grossly improbable, or he has an interest in the
> question at issue, courts and juries are not bound to refrain from
> exercising their judgment, and to blindly adopt the statements
> of such witness."

Port Huron Engine & Thresher Co. v. Sherman, 14 SD 461, 467-68, 85 NW 1008,

1010 (1901) (quoting Elwood v. Telegraph Co., 45 NY 549 (1871)).

> Under those circumstances, and even though there was nothing
> in any of the other evidence appearing in the record that would
> throw doubt upon plaintiff's credibility, yet the jury had a right,
> if they disbelieved him, to find that he did not take the
> assignment in payment of fees or a previous debt due him.  In
> *Nicholson v. Conner*, 8 Daly (NY) 212 it was held that the rule
> that, where a witness is unimpeached and his evidence not
> contradicted, his testimony cannot be disregarded by the court
> or jury, does not apply where such witness is a party, and the
> credibility of such party is always a question for the jury, and a
> verdict may be found against his uncontradicted evidence.

Hudson v. Sheafe, 41 SD 475, 484, 171 NW 320, 322 (1919).

> We believe this transaction as testified to by [the defendant] and
> his wife brings it squarely within the rule established in this
> state that where even unimpeached witnesses testify distinctly
> and positively to a fact and are uncontradicted, but the
> statements of the witnesses are grossly improbable or they have
> an interest in the question at issue, courts are not bound to

_____

(. . . continued)

   . . . .

> accept the statements of such witnesses. Crilly v. Morris, 70 SD 584, 19 NW2d 836 [(1945)] and cases cited.

Jorgensen v. Jorgensen, 74 SD 239, 251, 51 NW2d 632, 638 (1952).

[¶44.]     The testimony of attorney Niemann on this point has no independent source -- it is simply what he was told by his client Baldridge. Since the testimony was no better than its source the trial court was empowered not to rely upon it in arriving at its ultimate decision. *See* Roden v. Gen. Cas. of Wisconsin, 2003 SD 130, ¶16, 671 NW2d 622, 626.

[¶45.]     Having not heard or seen Baldridge personally, we are limited by our evidentiary standard of appellate review. While paying lip service to this concept, this Court then engages in a de novo review of Baldridge's testimony and finds him credible. Keeping in mind that the burden for habeas relief falls upon Baldridge, not the State, there is no finding by the trial court that Baldridge is credible. Instead after hearing Baldridge's claims and testimony it dismissed his petition. Since Baldridge's testimony was uncontested, had the trial court believed it, obviously Baldridge would have been entitled to prevail.

[¶46.]     There is no evidentiary basis to support the Court's conclusion that "counsel was not even aware that the State breached the terms of the plea agreement." Niemann had ten years experience in criminal defense work. He testified he had never had a malpractice case brought against him and Baldridge was the only client during this lengthy period of time to bring a habeas claim against him for ineffective representation. He testified at the habeas hearing, two and a half years after the sentencing hearing, to an extensive recollection of the de-

briefing process of his client by the Division of Criminal Investigation. Niemann further testified:

> I always-I got a copy of the PSI [pre-sentence investigation report] from the Court Services Officer, and I always read through that, and that always had the prior criminal history in it, and then I would take that over to the jail or at my office if they weren't in the jail, and have them read through the PSI because we are not allowed to make copies of that, and then after they had read through it, I would discuss it with them about what was in there, and about any additional information that they wanted me to present at the sentencing and I would fill that all out on my sentencing hearing form and get it all written down and go through it step by step at the sentencing hearing to make sure.

[¶47.] Moreover, one can only imagine the astonishment at the sentencing hearing had Baldridge's defense counsel entered an objection that the prosecutor had remained silent when the plea bargain called upon prosecutor to inform the court prior to sentencing that Baldridge had done nothing to assist law enforcement with investigations of drug activity of which he had knowledge.

[¶48.] Baldridge cannot have it both ways. He cannot be entitled to habeas relief on the basis of ineffective counsel because his attorney failed to inform the trial court his client did nothing to assist law enforcement. Had that astonishing event occurred, Baldridge no doubt would then have raised the claim that his attorney was ineffective because he *did* inform the trial court that Baldridge did nothing.

[¶49.] In a similar situation, the Eleventh Circuit Court of Appeals found no violation of an agreement on the part of the prosecution where the prosecutor promised not to oppose a defendant's request for a reduction of sentence conditioned on the defendant making a full and accurate disclosure to probation officials, which

the defendant failed to fulfill.  US v. Mahique, 150 F3d 1330, 1332 (11thCir 1998), *cert. denied*, Mahique v. US, 525 US 1090, 119 SCt 843, 142 LEd2d 698.  Notably, the Eleventh Circuit has also opined:

> The government did not breach its plea agreement with [the defendant].  By viewing a plea agreement as a contract, we imply that both the government and the defendant have obligations that they must perform to fulfill the agreement. *See* United States v. Howle, 166 F3d 1166, 1168 (11thCir 1999).  The language of the plea agreement indicates that [the defendant's] duty to make full disclosure to the government and probation office was a condition precedent to the government's agreement to recommend a sentence at the low end of the guideline range.  Based on the resolved facts in the PSI and the plea colloquy, [the defendant] did not make full and accurate disclosures to the probation office and misrepresented facts to the government . . . .

US v. Oduardo, 164 Fed Appx 945, 949, 2006 WL 231645, at *3 (11thCir 2006).

[¶50.]     For the above reasons, I would affirm the habeas court on this issue.  I concur in the balance of the issues of the Court that no showing for habeas relief has been made.  Thus, I would affirm the habeas court.