#24624-a-DG

**2008 SD 30**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

JASON D. ERICKSON,                                    Petitioner and Appellant,

   v.

DOUGLAS WEBER, Warden, South
Dakota State Penitentiary,                             Respondent and Appellee.

\* \* \* \*
APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
SPINK COUNTY, SOUTH DAKOTA

\* \* \* \*
HONORABLE SCOTT P. MYREN
Judge

\* \* \* \*

MARK McBRIDE
Beverly Hills, California
and
JULIA M. DVORAK and
REED RASMUSSEN of
Siegel, Barnett and Schutz
Aberdeen, South Dakota                      Attorneys for petitioner
                                             and appellant.

LAWRENCE E. LONG
Attorney General

FRANK GEAGHAN
Assistant Attorney General
Pierre, South Dakota                         Attorneys for respondent
                                             and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
ON FEBRUARY  11, 2007

OPINION FILED **04/16/08**

#24624

GILBERTSON, Chief Justice

[¶1.] On October 28, 2004, Jason Erickson (Erickson) filed a petition for writ of habeas corpus in the South Dakota Fifth Judicial Circuit alleging that the State failed to disclose evidence relevant to his sentencing. Erickson filed a supplemental petition on December 19, 2005. The habeas court heard the matter on May 26, 2006. Thereafter, the court denied Erickson's petition, filing its letter opinion on December 22, 2006, with findings of fact and conclusions of law entered on July 27, 2007. We affirm.

## FACTS AND PROCEDURE

[¶2.] Erickson's appeal from the habeas court arises from two aggravated assault convictions and his admission to a part 2 habitual offender information stemming from an armed standoff that started on the night of August 9, 2002. The incident began when law enforcement attempted to initiate a traffic stop after clocking Erickson traveling 95 mph in a 65 mph zone. Erickson, who later told a Department of Criminal Investigation agent that he did not stop because he was intoxicated and did not want a DUI, led law enforcement to his rural Spink County South Dakota home near Tulare.

[¶3.] When Erickson arrived at his property, a Spink County Sherriff's Deputy, who was on foot, attempted to stop his vehicle. However, Erickson continued on to his farmhouse, nearly running down the deputy in the process. Once inside, Erickson barricaded himself. Armed with numerous firearms and a large quantity of ammunition, he proceeded to hold officers from a number of northeastern South Dakota law enforcement agencies at bay for several hours.

During the standoff, Erickson fired multiple rounds of shotgun and rifle ammunition at law enforcement and their vehicles.

[¶4.]     Sometime after 4:00 a.m. on the morning of August 10, Detective Steve Pinok (Pinok) of the Aberdeen, South Dakota Police Department was contacted to assist in negotiations with Erickson. Unable to communicate with him by phone, Pinok was driven by armored personnel carrier to speak with Erickson through a farmhouse window. Pinok testified during his deposition that he asked Erickson, "what I could do or what I could provide to him to have him lay down his arms and come out peacefully."[1] Erickson told Pinok that he wanted assurances that he would not go to the penitentiary and that he would receive assistance with chemical dependency and mental health issues.

[¶5.]     Pinok relayed this information to Spink County State's Attorney, Victor Fischbach. At around 5:20 a.m., Fischbach, together with the Spink County Sheriff, Les Helm, left the scene of the standoff and drove to Redfield, South Dakota where Fischbach typed up a letter addressing Erickson's demands in exchange for his peaceable surrender to law enforcement. Fischbach and Sheriff Helm returned and gave the Letter to Pinok, who read it to Erickson from the armored personnel carrier. The Letter, on State's Attorney letterhead, dated August 10, 2002, referred to by the habeas court as the "Fischbach Letter," stated the following:

> In consideration of Jason Erickson laying down his arms
> and surrendering to law enforcement, the state agrees to
> help him get the assistance he needs with a chemical
> dependency and psychological evaluations. In exchange

---

1.     At the May 26, 2006 hearing, the parties stipulated to the admission of Pinok's deposition testimony.

> for Jason Erickson agreeing to pay restitution on the aggravated assault upon an officer, the state further agrees to consider not seeking a penitentiary sentence.
>
> The states [sic] position here is that Jason Erickson needs to get help and he realizes that. The states [sic] primary interest here is ensuring that nobody, including Jason Erickson, gets hurt or killed. The state will uphold this offer if Jason Erickson exits his house peacefully and immediately.

Fischbach then added the following hand-written note to the bottom of the Letter:

> Additional: I Hereby agree to A $10,000 dollar PR Bond upon condition of his turn In an [sic] booking and agreement to turn himself In for NEMH [Northeastern Mental Health] in Aberdeen, Brown Co. SD on 8-11-02 at 8:00 AM. Should these conditions not be followed the PR Bond will be revoked.
>
> VBF

During his deposition, Pinok testified that after reading the Fischbach Letter, he asked Erickson what he thought about the Letter. Pinok testified that Erickson replied, "It sounds good."

[¶6.]       Erickson subsequently surrendered to the chief deputy of the Spink County Sheriff's Department. Erickson was handcuffed. Pinok testified that he handed the Fischbach Letter to the chief deputy and that he "saw the chief deputy fold it up and put it into his pocket and tell Jason [Erickson], 'I've got it right here.'"

[¶7.]       On August 13, 2002, Erickson was indicted by a Spink County Grand Jury. He was charged with two counts of attempted first degree murder, four counts of aggravated assault, one count of felony intentional damage to property,

possession of a firearm by one with a prior violent crime conviction,[2] eluding law enforcement, reckless driving, obstructing law enforcement and resisting arrest. On September 10, 2002, a part 2 habitual offender information was filed against Erickson.

[¶8.]     Erickson retained defense counsel, Ron Volesky (Volesky), who arranged a plea agreement whereby Erickson agreed to plead guilty to two counts of aggravated assault and admit to the habitual offender information. In exchange, the State agreed to dismiss the remaining charges and file no further charges in connection with the standoff. Erickson appeared in circuit court on January 14, 2003 and pleaded guilty to the charges as set out in the plea agreement. The circuit court accepted the plea based on the factual basis in the record to support the charges and Erickson's acknowledgment of his agreement to the terms of the plea agreement. However, sentencing was stayed pending the completion of a presentencing investigation that had been requested by Erickson.

[¶9.]     On March 25, 2003, a stipulation for substitution of counsel was filed whereby attorney Terry Sutton (Sutton) was substituted for Volesky. Sutton filed a request to withdraw Erickson's pleas.[3] However, sentencing went ahead as scheduled. On August 19, 2003, Erickson was sentenced to 10 to 20 years

---

2.    Erickson had a prior felony conviction stemming from a shooting incident in Redfield, in 1999.

3.    The habeas court found that the record was unclear as to whether Erickson abandoned this request or the circuit court denied it.

indeterminate on each of the two aggravated assault counts, to be served consecutively. On June 25, 2004, the South Dakota Board of Pardons and Paroles set the term on each of the two counts at 20 years.

[¶10.] Erickson filed a *pro se* habeas petition on October 28, 2004. On November 15, 2004, attorney Kenneth Tschetter (Tschetter) filed a notice of appearance on behalf of Erickson in the habeas action. On January 25, 2005, a substitution of attorney was filed along with motion for *pro hac vice* requesting admission of attorney Mark McBride (McBride) from Hollywood, California to represent Erickson in the habeas action. McBride was admitted to represent Erickson on January 27, 2005.

[¶11.] On May 5, 2005, McBride wrote Fischbach a letter in which he indicated that he had reviewed the record, including "station logs" compiled by law enforcement during Erickson's standoff. McBride went on to state that from the station logs, "it appears that you went to the scene of the incident, left the scene to type up an agreement [the Fischbach Letter], and returned shortly thereafter with the agreement."[4] He further stated, "It is my understanding that this agreement contained a plea bargain between you and my client, Mr. Erickson, and that this plea agreement contained statements made by my client."

[¶12.] On September 6, 2005, McBride filed a notice of hearing to compel discovery along with an affidavit in support of said discovery motion. On

---

4. The station logs included an entry on August 10, 2003, at 0520 hours indicating that Fischbach left the scene of the stand to go to his office in Redfield. Another entry at 0543 hours notes Fischbach's return with "the agreement."

#24624

September 15, 2005, Fischbach sent a letter to McBride explaining that he had just received a correspondence from the Spink County Sheriff's Department indicating that the Fischbach Letter had been located in a "Do Not Destroy" evidence file at the Sheriff's office. Fischbach enclosed a copy of the Fischbach Letter with the letter to McBride.

[¶13.]     Subsequently, attorneys Volesky, Sutton and Tschetter each filed affidavits in connection with Erickson's habeas action. All three attorneys denied having knowledge of the Fischbach Letter until it was shown to them by McBride in mid-October 2005.

[¶14.]     At the hearing on May 26, 2006, Erickson alleged that the State failed to disclose evidence favorable to him, thereby violating his right to due process. Erickson argued that his guilty plea should be vacated or corrected to take account of the alleged plea agreement in the Fischbach Letter. Fischbach testified that there was only one copy of the Fischbach Letter and that following the standoff, he believed that Erickson had it in his possession.

[¶15.]     The habeas court found that both Erickson and Fischbach knew of the Fischbach Letter and that neither told Volesky, Sutton or Tschetter about its existence; that there was no evidence that the Fischbach Letter was ever in Erickson's case file and that Fischbach neither knowingly or intentionally failed or refused to produce the Fischbach Letter for any of Erickson's attorneys; that Fischbach believed there to be one copy of the Fischbach Letter and that he believed it was in Erickson's possession; that Fischbach responded truthfully to McBride's May 5, 2005 request for the Fischbach Letter when he told him that he did not have it and that it was not until McBride filed his motion to compel discovery that

Fischbach contacted the Spink County Sheriff's Office and learned that the Letter was in the Sheriff's custody.[5]

[¶16.]    The habeas court denied Erickson's petition concluding that while the Fischbach Letter had been inadvertently suppressed and that it contained information that Erickson's attorneys would have wanted to know about prior to sentencing, Erickson was not prejudiced in any way by the State's failure to produce it sooner.  The court concluded that the Fischbach Letter simply did not contain any promise that Erickson would not be incarcerated and that given the context within which the considerations therein were negotiated, it was not a legally enforceable document.

[¶17.]    Erickson raises two issues on appeal:

> 1.    Whether the State suppressed evidence in violation of Erickson's due process rights when it allegedly failed to disclose to defense counsel the existence of an alleged plea agreement contained in the Fischbach Letter.
>
> 2.    Whether Erickson was entitled to specific performance of the alleged plea agreement contained in the Fischbach Letter.

### STANDARD OF REVIEW

> Our review of habeas corpus proceedings is limited because it is a collateral attack on a final judgment.  New v. Weber, 1999 SD 125, ¶5, 600 NW2d 568, 571 (citing Lien v. Class, 1998 SD 7, ¶10, 574 NW2d 601, 606) (other citation omitted).  It is not a substitute for direct review.  *Id.* (citing Loop v. Class, 1996 SD 107, ¶11, 554 NW2d 189, 191) (other citation omitted).  We are guided by a well-established standard of review:

---

5.    By May 5, 2005, Fischbach was no longer the Spink County State's Attorney.

> Habeas corpus can be used only to review (1) whether the court has jurisdiction of the crime and the person of the defendant; (2) whether the sentence was authorized by law; and (3) in certain cases whether an incarcerated defendant has been deprived of basic constitutional rights. Habeas corpus is not a remedy to correct irregular procedures, rather, habeas corpus reaches only jurisdictional error. For purposes of habeas corpus, constitutional violations in a criminal case deprive the trial court of jurisdiction. Further, we may not upset the habeas court's findings unless they are clearly erroneous.

> Bradley v. Weber, 1999 SD 68, ¶12, 595 NW2d 615, 619 (quoting Flute v. Class, 1997 SD 10, ¶8, 559 NW2d 554, 556) (other citations omitted). The habeas applicant has the initial burden, by a preponderance of the evidence, to prove entitlement to relief. *New*, 1999 SD 125, ¶5, 600 NW2d at 572 (citing *Lien*, 1998 SD 7, ¶11, 574 NW2d at 607). We may affirm the ruling of the habeas court if it is "right for any reason." *Id.* (citing Satter v. Solem, 458 NW2d 762, 768 (SD 1990)) (other citation omitted).

Krebs v. Weber, 2000 SD 40, ¶5, 608 NW2d 322, 324 (*overruled on other grounds*).

We review findings of fact under the clearly erroneous standard, while we give no deference to conclusions of law and thereby apply the de novo standard. State v. Runge, 2006 SD 111, ¶9, 725 NW2d 589, 592 (citations omitted).

## ANALYSIS AND DECISION

[¶18.] **1. Whether the State suppressed evidence in violation of Erickson's due process rights when it allegedly failed to disclose to defense counsel the existence of an alleged plea agreement contained in the Fischbach Letter.**

> [S]uppression by the prosecution of evidence favorable to an accused *upon request* violates due process where the evidence is material either to guilt *or punishment* irrespective of the good faith or bad faith of the prosecution.

Brady v. Maryland, 373 US 83, 87, 83 SCt 1194, 1196-97, 10 LEd2d 215 (1963)

(emphasis added).  Since *Brady*, the United States Supreme Court has handed

down several opinions, expanding the scope of what constitutes prosecutorial

suppression of evidence that rises to the level of a due process violation.  The

Supreme Court's opinion in *Strickler v. Greene*, 527 US 263, 119 SCt 1936, 144

LE2d 286 (1999), sets out the evolution of the *Brady* doctrine:

> **[T]he duty to disclose [*Brady*] evidence is applicable
> even though there has been no request** by the accused,
> United States v. Agurs, 427 US 97, 107, 96 SCt 2392,
> [2399], 49 LEd2d 342 (1976), and that the duty encompasses
> impeachment evidence as well as exculpatory evidence,
> United States v. Bagley, 473 US 667, 676, 105 SCt 3375,
> [3380], 87 LEd2d 481 (1985).  Such **evidence is material
> "if there is a reasonable probability that, had the
> evidence been disclosed to the defense, the result of
> the proceeding would have been different."** *Id.,* at 682,
> 105 SCt [at 3383, 87 LE2d 481]; *see also* Kyles v. Whitley,
> 514 US 419, 433-434, 115 SCt 1555, [1565], 131 LEd2d
> 490 (1995).  Moreover, **the rule encompasses evidence
> "known only to police investigators and not to the
> prosecutor."** *Id.* at 438, 115 SCt [at 1568, 131 LEd2d
> 490].  In order to comply with *Brady,* therefore, "the
> individual **prosecutor has a duty to learn of any favorable
> evidence known to the others acting on the government's
> behalf** in this case, including the police." *Kyles,* 514 US
> at 437, 115 SCt [at 1567, 131 LEd2d 490].

*Strickler*, 527 US at 280-81, 119 SCt at 1948, 144 LE2d 286 (emphasis added).

[¶19.]     Despite the expansion of the *Brady* doctrine to include cases where the

defendant made no request for disclosure, "the defendant must still prove that the

government, in fact, suppressed the evidence in question . . . ."  United States v.

LeRoy, 687 F2d 610, 618 (2dCir 1982), *cert. denied*, 459 US 1174, 103 SCt 823, 74

LE2d 1019 (1983) (citation omitted).  Still, *Brady* requirements presuppose that the

evidence in question is unknown to the defendant or would remain unknown to him

after exercising a reasonable diligent effort to discover. State v. Wilde, 306 NW2d 645, 647 (SD 1981).

> The purpose of the Brady rule is not to provide a defendant with a complete disclosure of all evidence in the government's file which might conceivably assist him in preparation of his defense, but to assure that he will not be denied access to exculpatory evidence known to the government but unknown to him.

*Id.* (citing United States v. Ruggiero, 472 F2d 599, 604 (2ndCir 1973)); United States v. Cravero, 545 F2d 406, 420 (5thCir 1976). "If a defendant knows or should know of the allegedly exculpatory evidence, it cannot be said that the evidence has been suppressed by the prosecution." *Id.* (citing United States v. Brown, 628 F2d 471 (5thCir 1980)). *See also* Rodriquez v. Weber, 2000 SD 128, ¶15, 617 NW2d 132, 139 (quotation omitted); United States v. Payne, 63 F3d 1200, 1208 *cert. denied* 516 US 1165, 116 SCt 1056, 134 LEd2d 201 (1996) (recognizing that evidence is not suppressed within the meaning of *Brady* "if the defendant *or his attorney*" knew, or should have known, about the evidence) (emphasis added) (citations omitted). The *Brady* doctrine does not absolve a defendant of his responsibility to discover evidence relevant to his defense or sentencing. *Wilde*, 306 NW2d at 647.

[¶20.] The findings and the underlying evidence support the conclusion of the habeas court that the Fischbach Letter had information that the defense would have wanted to know about and that it had been "inadvertently suppressed by the State." The Letter contained Fischbach's statement that alternative remedies to imprisonment would be considered in exchange for Erickson's immediate peaceable surrender. At the time of Erickson's sentencing, the Fischbach Letter was in the possession of the Spink County Sheriff's Department. The *Brady* doctrine, as

enlarged by *Agurs* and *Kyles*, imposed a duty upon the State to learn about the existence of this document in the Sheriff's "Do Not Destroy" evidence file regardless of a request by Erickson. *See Agurs,* 427 US at 107, 96 SCt at 2399, 49 LEd2d 342; *Kyles*, 514 US at 437, 115 SCt at 1567, 131 LEd2d 490. However, as the habeas court concluded, this alone was not determinative to its ultimate decision to deny Erickson petition.

[¶21.] On May 26, 2006, Fischbach testified before the habeas court that he learned, following Pinok's first attempt at negotiations, that Erickson had specifically asked for Fischbach to draft an agreement setting out the terms, as dictated by Erickson, under which he would agree to lay down his arms and surrender peaceably. Fischbach left the scene of the standoff with Sheriff Helm and returned a short time later with the Fischbach Letter. Pinok testified during his deposition that he read the entire Letter aloud to Erickson, and that Erickson acknowledged his approval. Pinok also testified that after Erickson surrendered and while in his presence he, Pinok, handed the Letter to the chief deputy, who then "folded it up and put it into his coat pocked and [told] Jason [Erickson], 'I've got it right here.'"

[¶22.] The foregoing testimony of Fischbach and Pinok establishes evidentiary support for the finding of the habeas court that Erickson knew about the Fischbach Letter prior to his sentencing. However, Erickson failed to submit any evidence that he took any action, at any time between the standoff and sentencing, to request the Letter from the State or to inform any of his attorneys about the existence of the Letter so that they might request it on his behalf. *See*

*Wilde*, 306 NW2d at 647 (claim of suppression is precluded where defendant fails to demonstrate reasonable diligence to discover). Moreover, the fact that McBride, post-sentencing, discovered the existence of the Fischbach Letter through his own review of the station logs indicates that Erickson's three other attorneys should have been able to discover the existence of the Letter, notwithstanding Erickson's failure to inform.

[¶23.]    Finally, Erickson's argument that the State suppressed *Brady* evidence, thereby violating his right to due process, fails because he cannot show that the Fischbach Letter was material to his sentence. We find no reasonable probability that the language, "the [S]tate . . . agrees to consider not seeking a penitentiary sentence," would have resulted in a different sentence had the Fischbach Letter been disclosed prior to sentencing.

[¶24.]    We find that there is evidentiary support for the habeas court's findings of fact and conclusions of law and therefore, no violation of Erickson's right to due process arising from the State's inadvertent suppression of the Fischbach Letter.

[¶25.]    **2.    Whether Erickson was entitled to specific performance of the alleged plea agreement contained in the Fischbach Letter.**

[¶26.]    As a matter of equity, Erickson contends that he is entitled to "the benefit of his bargain." Consequently, Erickson avers that his sentence should either be vacated or corrected to reflect an agreement that he alleges Fischbach entered into with him on behalf of the State.

[¶27.]     "Generally, plea agreements are contractual in nature and are governed by ordinary contract principles." State v. Waldner, 2005 SD 11, ¶8, 692 NW2d 187, 190 (quoting State v. Stevenson, 2002 SD 120, ¶9, 652 NW2d 735, 738). "Like all contracts, [plea agreements] include[ ] an implied obligation of good faith and fair dealing." Vanden Hoek v. Weber, 2006 SD 102, ¶14, 724 NW2d 858, 862 (alterations original) (citations omitted). A party is entitled to rescission when his consent to a contract is "obtained through duress . . . or undue influence exercised by or with the connivance of the party as to whom he rescinds[.]" SDCL 53-11-2(1). More specifically, "[p]romises extorted through violence and coercion are no promises at all; they are void from the beginning and unenforceable as a matter of public policy." State v. Rollins, 359 A2d 315, 318 (RI 1976) (affirming the decision below sustaining the government's objection to testimony by a prison official pertaining to a promise of immunity in exchange for the surrender of the defendant, who was engaged in a prison uprising during which a guard had been taken hostage). See also People v. Pasch, 604 NE2d 294, 303 (Ill 1992).

[¶28.]     In Pasch, the Illinois Supreme Court affirmed the decision below denying the defendant's motion for specific performance of a promise allegedly made by law enforcement during circumstances comparable to the instant case. The defendant had killed two persons, taken a hostage and was engaged in an armed standoff with law enforcement. Id. at 301. The defendant eventually surrendered and thereafter, alleged that negotiators had promised him that if he surrendered, the death penalty would not be sought. Id. at 302. In affirming the

decision below denying the defendant's motion for an evidentiary hearing on the request for specific performance, the court opined:

> It is clear that defendant did not enter into a plea bargain with the State when the police promised him that they would not seek the death penalty if he would surrender. Defendant never said during the negotiations that he would plead guilty to the charges, and the prosecutor never accepted a plea in exchange for a lesser sentence than death, nor did defendant ever actually plead guilty to the charges against him. *It is only where a defendant enters a guilty plea in reliance upon the promises of a prosecutor that he is entitled to a remedy when such promises are breached.* Santobello v. New York, 404 US 257, 262, 92 SCt 495, 499, 30 LEd2d 427 (1971).

*Id*. (emphasis added).

[¶29.]     Similar to the alleged promise in *Pasch*, the Fischbach Letter did not constitute a plea agreement. Erickson did not offer to plead guilty; nor were any charges discussed. The Letter merely set out consideration that would be accorded Erickson if he were to surrender.

[¶30.]     Moreover, had there been an agreement it would have been void from the beginning and unenforceable. *See supra* ¶27 (quoting *Rollins*, 359 A2d at 318). Erickson was engaged in a lengthy standoff with several law enforcement agencies that spanned two days. By the accounts of law enforcement testimony, Erickson had fired numerous rounds of rifle and shotgun ammunition at them and their vehicles during the standoff. It was within the context of this highly volatile and dangerous atmosphere that Erickson set out the conditions under which he would surrender. Clearly, law enforcement had been subjected to considerable duress during this violent and coercive situation. Accordingly, as a matter of public policy we agree with the habeas court that under these circumstances there was nothing

#24624

in the Fischbach Letter that was legally enforceable and the State was in no way obligated thereby.

[¶31.] Affirmed.

[¶32.] SABERS, KONENKAMP and MEIERHENRY, Justices, concur.

[¶33.] ZINTER, Justice, concurs specially.


ZINTER, Justice (concurring specially).

[¶34.] I disagree with the conclusion that the Fishbach Letter was not material. *See supra* ¶23. Both trial counsel representing Erickson would have used it in analyzing the case and negotiating the terms of the plea agreement. Counsel would have certainly presented it to the sentencing judge in arguing for an appropriate sentence. Nevertheless, as the Court points out, habeas corpus relief is not warranted because Erickson had knowledge of the Letter, and therefore it was not suppressed.